BLANK ROME **JUDGE DANIELS**
Attorneys for Plaintiff
Jeremy J.O. Harwood
Alan M. Weigel
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



**'09 CIV 8392**

| | |
|---|---|
| BOA OFFSHORE AS, | |
| Plaintiff, | 09 Civ. |
| v. | **VERIFIED COMPLAINT** |
| OCEAN MEXICANA, S.A. de C.V., | |
| Defendant. | |

Plaintiff BOA OFFSHORE AS ("Plaintiff"), as Owner of the M/V BOA ROVER, by its attorneys Blank Rome LLP, complaining of the above-named Defendant OCEAN MEXICANA, S.A. de C.V. ("Defendant"), alleges upon information and belief as follows:

1.     This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction. The action is also brought pursuant to 9 U.S.C. § 8.

2.     At all material times, Plaintiff was and now is a foreign company organized and existing under the laws of Norway.

3.    At all material times, Defendant was and now is a corporation organized and existing by virtue of another foreign nation with an office at Paseo de la Reforma, 115 Pisoll, Col. Lomas de Chapultepec, Mexico, D.F.

## THE BASIC FACTS

4.    By a charter party dated on or about December 19, 2007 ("the Charter"), Plaintiff chartered the M/V BOA ROVER ("the Vessel") to Defendant for a period of five years. A copy is attached as Exhibit 1 to the accompanying Rule B affidavit ("Aff.")

5.    Under the terms of the Charter, Defendant is required to pay Charter hire in the sum of USD "$49,000.00 per day excluding fuel and lubs and any taxes/surcharges."

6.    Plaintiff performed all obligations required of it under the terms of the Charter, but Defendant, wrongfully and in breach of its obligations, failed to pay outstanding Charter hire in the sum of $14,258,729.35, which remains unpaid, despite due demand. A copy of the Account's Receivable Statement is annexed as Exhibit 2.

7.    The Charter is subject to English law and London arbitration.  Plaintiff has or shortly will demand arbitration.  This action is expressly filed without prejudice to that right of arbitration.

## COUNT I

## RULE B RELIEF

8.    Plaintiff repeats paragraphs 1 through 7 as if fully set forth herein.

9.    Plaintiff seeks issuance of process of maritime attachment so that it may obtain security for its claims including its English attorneys' fees and arbitrators' fees

which are routinely awarded in London arbitration and no security for Plaintiff's claim has been posted by Defendants or anyone acting on its behalf to date.

10.    At best as can now be estimated, Plaintiff expects to recover the following amounts in the arbitration:

| | | |
|---|---|---|
| A. | On the principal claim | $14,258,729.35 |
| B. | Estimated Recoverable English Lawyers and Arbitrators' Fees & "Costs" | $200,000.00 |
| C. | Interest over the course of 3 years at prime rate average of 6% per annum: | $855,523.76 |
| | **TOTAL**: | $15,314,253.11 |

11.    Defendants cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule B"), but is believed to have, or will have during the pendency of this action, assets in this jurisdiction consisting of cash, funds, freight, hire, and/or credits in the hands of garnishees in this District, including but not limited to electronic fund transfers and/or CHIPS credits, because Defendant conducts business internationally in U.S. Dollars, and all electronic fund transfers are processed by intermediary banks in the United States, primarily in New York.

12.    Plaintiff's belief that Defendant's property may be found in this District is based on the fact that Defendant has previously made payments to Plaintiff in U.S. dollars, as required by the provisions of the Charter.

13.     The named garnishee banks participate in the CHIPS system in New York to send U.S. dollar wire transfers between banks in the United States and through the world.

14.     Accordingly, Plaintiff believes that some assets of Defendant in U.S. dollars EFTs will be transferred through intermediary CHIPS banks, including the named garnishee banks.

**WHEREFORE**, Plaintiff prays:

A.     That process in due form of law issue against Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.     That since Defendant cannot be found within this District pursuant to Rule B, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of Defendant's tangible or intangible property or any other funds held by any garnishee, which are due and owing to Defendant up to the amount of **$15,314,253.11** to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B, answer the matters alleged in the Verified Complaint;

C.     That since it appears that the U.S. Marshal's Service lacks sufficient staff to effect service of process of Maritime Attachment and Garnishment promptly or economically, and that since appointing a person over 18 years of age and who is not a party to this action will result in substantial economies in time and expense, such a person be appointed pursuant to Fed.R.Civ.P. 4(c) to serve process of Maritime Attachment and Garnishment in this action.

D.    That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with the pending claims including appeals thereof.

E.    That Plaintiff may have such other, further and different relief as may be just and proper.

Dated: New York, NY
       October 2, 2009

Respectfully submitted,
BLANK ROME LLP
Attorneys for Plaintiff

By _____
Jeremy J.O. Harwood
Alan M. Weigel
405 Lexington Avenue
New York, NY 10174
Tel.: (212) 885-5000

## VERIFICATION

STATE OF NEW YORK     )
                            : ss.:
COUNTY OF NEW YORK    )

Alan M. Weigel, being duly sworn, deposes and says:

1.      I am a member of the bar of this Honorable Court and associated with the firm of Blank Rome LLP, attorneys for Plaintiff.

2.      I have read the foregoing Complaint and I believe the contents thereof are true.

3.      The reason this Verification is made by deponent and not by Plaintiff is that Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.      The sources of my information and belief are documents provided to me and statements made to me by representatives of Plaintiff.

_____
ALAN M. WEIGEL

Sworn to before me this
2nd day of October, 2009

_____
Notary Public

KARL V. REDA
Notary Public, State of New York
No. 30-4783126. Qual. in Nassau Cty,
Certificate Filed in New York County
Commission Expires NOV-30, 2009

# EXHIBIT 1

Issued by The Documentary Committee of
The Baltic and International Maritime Council (BIMCO), Copenhagen
(First edition published 1975)
REVISED 1989

Printed by BIMCO's idea

Adopted by
International Support Vessel Owners'
Association (ISOA), London

Copyright, published by
The Baltic and International Maritime Council (BIMCO), Copenhagen
September 1989

| | |
|---|---|
| **1.** Place and date <br> Trondheim, 19.12.2007 | **UNIFORM TIME CHARTER PARTY** <br> **FOR OFFSHORE SERVICE VESSELS** <br> **CODE NAME: "SUPPLYTIME 89"** <br> PART I |

| | | |
|---|---|---|
| **2.** Owners/Place of business (full style, address and telex/telefax no.) (Cl. 1(a)) <br> **Boa Offshore AS** <br> **Pir II, 13A, Kai 9** <br> **7010 Trondheim** <br> **Norway** | **3.** Charterers/Place of business (full style, address and telex/telefax no.) (Cl. 1(a)) <br> **Ocean Mexicana, S.A. de C.V.** <br> **Part of Blue Marine Group** | |
| **4.** Vessel's name (Cl. 1(a)) <br> **Boa Rover** | **5.** Date of delivery (Cl. 2(a)) <br> **In direct continuation from present 12 months firm period in the contract dated 02.08.2006.** | **6.** Cancelling date (Cl. 2(a) and (c)) <br> **N/A** |
| **7.** Port or place of delivery (Cl. 2(a)) <br> **Port In US Gulf or any port in Mexican water in the Gulf of Mexico in Owners option.** | **8.** Port or place redelivery/notice of redelivery (Cl. 2(a)) <br> **Port in US Gulf in Owners option.** <br> (i) Port or place of redelivery <br><br> **90 days** <br> (ii) Number of days' notice of redelivery | |
| **9.** Period of hire (Cl. 1(a)) <br> **5 years** | **10.** Extension of period of hire (optional) (Cl. 1(b)) <br> **4 x 180 days at Charterers operions** <br> (i) Period of extension <br><br> **90 days for each extension period. Additional extensions to be mutually agreed by the Parties.** <br> (ii) Advance notice for declaration of option (days) | |
| **11.** Automatic extension period to complete voyage or well (Cl. 1(c)) <br> **N/A** <br> (i) Voyage or well (state which) <br><br> **20 days or the time taken for demob of Charterer's equipment installed onboard.** <br> (ii) Maximum extension period (state number of days) | **12.** Mobilisation charge (lump sum and when due) (Cl. 2(b)(i)) <br> **N/A** <br> (i) Lump sum <br> **N/A** <br> (ii) When due | |
| | **13.** Port or place of mobilisation (Cl. 2(b)(i)) <br> **Mexican Safe port or US safe port to be mutually agreed.** | |
| **14.** Early termination of charter (state amount of hire payable) (Cl. 26(a)) <br> **Remaining hire period at contractual rate.** <br> **Only expemption:** <br> **the Charterers have the option to terminate this time charter party at the end of the first 3 months, if working permisssion is not granted a penalty of 1 millions dollars will be paid to Owners, by givng a 30 days notice.** | **15.** Number of days' notice of early termination (Cl. 26(a)) <br> **90 days** | **16.** Demobilisation charge (lump sum) (Cl. 2(a) and Cl. 26(a)) <br> **N/A** |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                                    PART I

| | |
|---|---|
| 17. Area of operation (Cl. 5(a))<br>World wide. | 18. Employment of vessel restricted to (state nature of service(s)) (Cl. 5(a))<br>Transport of all types of oilfield equipment, subsea services incl. diving and ROV and associated duties as directed by Charterer but always whithin the vessel's capabilities and capacities. |
| 19. Charter hire (state rate and currency) (Cl. 10(a) and (d) )<br>USD         ../day excl. fuel and lubs and any taxes/surcharges | 20. Extension hire (if agreed, state rate) (Cl. 10(b))<br>5% yearly increase in hire rate. |
| 21. Invoicing for hire and other payments (Cl. 10(d))<br><br>(i) state whether to be issued in advance or arrears<br>2 months in advance<br><br>(ii) state to whom to be issued if addressee other than stated in Box 2<br>Boa Offshore AS<br><br>(iii) state to whom to be issued if addressee other than stated in Box 3<br>N/A | 22. Payments (state mode and place of payment also state beneficiary and bank account) (Cl. 10(c))<br>As per instruction on Owners invoice(s). Payment monthly in advance. |

| | | |
|---|---|---|
| 23. Payment of hire, bunker invoices and disbursements for Charterers' account (state maximum number of days) (Cl. 10(e))<br>30 days after invoice received by fax/e-mail | 24. Interest rate payable (Cl. 10(n))<br>12% p.a. | 25. Maximum audit period (Cl. 10(f))<br>N/A |

| | | |
|---|---|---|
| 26. Meals (state rate agreed) (Cl. 5(c)(i))<br>To be supplied and served by Charterers at Charterers account. | 27. Accommodation (state rate agreed) (Cl. 5(c)(i))<br>See box. 26. | 28. Mutual Waiver of Recourse (optional, state whether applicable) (Cl. 12(h))<br>Clause 12 to apply |

| | |
|---|---|
| 29. Sublet (state amount of daily increment to charter hire) (Cl. 17(b))<br>N/A | 30. War (state name of countries) (Cl. 19(e))<br>According to list of declared war zones. |
| 31. General average (place of settlement – only to be filled in if other than London)<br>(Cl. 21)<br>London | 32. Breakdown (state period) (Cl. 26(h)(v))<br>14 days |
| 33. Law and arbitration (state Cl. 31(a) or 31(b) or 31(c), as agreed; if Cl. 31(c) agreed also state place of arbitration) (Cl. 31)<br>English law, arbitration London. | 34. Numbers of additional clauses covering special provisions, if agreed<br>3 (cl. 37, 38( addendum 1), 39(addendum 2)) |

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

"SUPPLYTIME 89" UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS                    PART I

| 35. Names and addresses for notices and other communications required to be given by the Owners (CL 20)<br><br>TBA | 36. Names and addresses for notices and other communications required to be given by the Charterers (CL 20)<br><br>TBA |
|---|---|

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but no further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 20.

| Signature (Owners) | Signature (Charterers) |
|---|---|

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" - dated



## INSURANCE

Insurance policies (as applicable) to be procured and maintained by
the Owners under Clause 14:

(1) *Marine Hull Insurance.* – Hull and Machinery  Insurance shall be
provided with limits equal to those normally carried by the Owners
for the Vessel.

(2) *Protection and Indemnity (Marine Liability) Insurance.* –
Protection and Indemnity or Marine Liability insurance shall be
provided for the Vessel with a limit equal to the value under
paragraph 1 above or U.S. $5 million, whichever is greater, and
shall include but not be limited to coverage for crew liability, third
party bodily injury and property damage liability, including
collision liability, towers liability (unless carried elsewhere).

(3) *General Third Party Liability Insurance.* – Coverage shall be for:
Bodily Injury          per person
Property Damage        per occurrence.

(4) ~~*Workmen's Compensation and Employer's Liability Insurance for*~~
~~*Employees.*   Covering non-employees for statutory benefits as~~
~~set out and required by local law in area of operation or area in~~
~~which the Owners may become legally obliged to pay benefits.~~

(5) ~~*Comprehensive General Automobile Liability Insurance.*~~
~~Covering all owned, hired and non-owned vehicles, coverage~~
~~shall be for:~~

~~Bodily Injury          According to the local law.~~
~~Property Damage        In an amount equivalent to~~
~~single limit per occurrence.~~

(6) ~~Such other insurances as may be agreed.~~

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made
to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or
expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" - dated



## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE

*(Optional, only applicable if stated in Box 20 in PART I)*

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the operations ("Signatory" or collectively "Signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liabilities for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another Signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall create any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub-contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




**PART II**
**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**

**1. Period**
(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as 'the Vessel'), for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers.
(b) Subject to Clause 10(b), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(i), but such an option must be declared in accordance with Box 10(ii).
(c) The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(ii)) in progress, such time not to exceed the period stated in Box 11(iii).

**2. Delivery and Redelivery**
(a) Delivery. - Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat.
(b) Mobilisation. - (i) The Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7. The mobilisation charge shall not be affected by any change in the port or place of mobilisation from that stated in Box 13.
(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, the Vessel and/or goods lost or not lost.
(c) Cancelling. - If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party. However, if despite the exercise of due diligence by the Owners, the Owners will be unable to deliver the Vessel by the cancelling date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 5, and shall state in such notice the date by which they will be able to deliver the Vessel. The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party. If the Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party.
(d) Redelivery. - The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place as stated in Box 8(i) or such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii).
(e) Demobilisation. - The Charterers shall pay a lump sum without discount in the amount as stated in Box 16 by way of demobilisation charge which amount shall be paid on the expiration or on earlier termination of this Charter Party.

**3. Condition of Vessel**
(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A", attached hereto, and undertake to so maintain the Vessel during the period of service under this Charter Party.
(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in every way fit to operate effectively at all times for the services as stated in Clause 5.

**4. Survey**
The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing the condition of the Vessel, any anchor handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys.

**5. Employment and Area of Operation**
(a) The Vessel shall be employed in offshore activities which are lawful in

accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 18, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 17 which shall always be within Institute Warranty Limits and which shall in no circumstances be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment. Unless otherwise agreed, the Vessel shall not be employed as a diving platform.
(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained and paid by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences.
(c) The Vessel's Space. - The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations:
(i) Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's Crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 26 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for persons using berth accommodation.
(ii) Lawful cargo whether carried on or under deck.
(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo.
(iv) Hazardous and noxious substances, subject to Clause 12(a), proper notification and any relevant regulations.
(d) Laying-up of Vessel. - The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel.

**6. Master and Crew**
(a) (i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.
(ii) The Master shall sign cargo documents as and in the form presented, the same, however, not to be Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agents.
(b) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in part as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**PART II**
**"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels**

alongside offshore units. If the port regulations or the seamen and/or labour 143
unions do not permit the Crew of the Vessel to carry out any of this work, then 144
the Charterers shall make, at their own expense, whatever other 145
arrangements may be necessary, always under the direction of the Master. 146
(c) If the Charterers have reason to be dissatisfied with the conduct of the 147
Master or any Officer or member of the Crew, the Owners on receiving 148
particulars of the complaint shall promptly investigate the matter and if the 149
complaint proves to be well founded, the Owners shall as soon as reasonably 150
possible make appropriate changes in the appointment. 151
(d) The entire operation, navigation, and management of the Vessel shall be in 152
the exclusive control and command of the Owners, their Master, Officers and 153
Crew. The Vessel will be operated and the services hereunder will be 154
rendered as requested by the Charterers, subject always to the exclusive 155
right of the Owners or the Master of the Vessel to determine whether operation 156
of the Vessel may be safely undertaken. In the performance of the Charter 157
Party, the Owners are deemed to be an independent contractor, the 158
Charterers being concerned only with the results of the services performed. 159

**7. Owners to Provide** 160
(a) The Owners shall provide and pay for all provisions; wages and all other 161
expenses of the Master, Officers and the rest of the marine Crew provided by 162
Owners, except for the transportation all Owners screw from the nearest 162
port/helicopter alport to the vessel and from the vessel to the nearest
port/helicopter airport which shall be paid and provided by Charterers; all
maintenance and repair of the
Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, 163
except as otherwise provided in this Charter Party, for all insurance on the 164
Vessel, all dues and charges directly related to the Vessel's flag and/or 165
registration, all deck, cabin and engineroom stores, cordage required for 166
ordinary ship's purposes mooring alongside in harbour, and all fumigation 167
expenses and de-ratisation certificates. The Owners' obligations under this 168
Clause extend to cover all liabilities for consular charges appertaining to the 169
Master, Officers and Crew, customs or import duties arising at any time during 170
the performance of this Charter Party in relation to the personal effects of the 171
Master, Officers and Crew, and in relation to the stores, provisions and other 172
matters as aforesaid which the Owners are to provide and/or pay for and the 173
Owners shall refund to the Charterers any sums they or their agents may have 174
paid or been compelled to pay in respect of such liability. 175
(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' 176
expense with any towing and anchor handling equipment specified in Section 177
5(b) of ANNEX "A". If during the Charter Period any such equipment becomes 178
lost, damaged or unserviceable, other than as a result of the Owners' 179
negligence, the Charterers shall either provide, or direct the Owners to 180
provide, an equivalent replacement at the Charterers' expense. 181

**8. Charterers to Provide** 182
(a) While the Vessel is on hire the Charterers shall provide and pay for all 183
provisions, fuel,
lubricants, water, dispersants, firefighting foam and transport thereof, port 184
charges, pilotage and boatmen and canal steersmen (whether compulsory or 185
not), launch hire (unless incurred in connection with the Owners' business), 186
light dues, tug assistance, canal, dock, harbour, tonnage and other dues and 187
charges, agencies and commissions incurred on the Charterers' business, 188
costs for security or other watchmen, and of quarantine (if occasioned by the 189
nature of the cargo carried or the ports visited whilst employed under this 190
Charter Party but not otherwise). 191
(b) At all times the Charterers shall provide and pay for the loading and 192
unloading of cargoes so far as not done by the Vessel's crew, cleaning of 193
cargo tanks, all necessary dunnage, uprights and shoring equipment for 194
securing deck cargo, all cordage except as to be provided by the Owners, all 195
ropes, slings and special runners (including bulk cargo discharge hoses) 196
actually used for loading and discharging, worn gas required for the 197
protection of cargo, and electrodes used for offshore works, and shall 198
reimburse the Owners for the actual cost of replacement of special mooring 199
lines to offshore units, wires, nylon spring lines etc. used for offshore works, 200
all hose connections and adaptors, and further, shall refill oxygen/acetylene 201
bottles used for offshore works. 202
(c) The Charterers shall pay for customs duties, all permits, import duties 203
(including costs involved in establishing temporary or permanent importation 204
bonds), and clearance expenses, both for the Vessel and/or equipment, 205
required for or arising out of this Charter Party. 206

**9. Bunkers** 207
Unless otherwise agreed, the Vessel shall be delivered with bunkers and 208

lubricants as on board and redelivered with sufficient bunkers to reach the 209
next bunkering stage en route to her next port of call. The Charterers upon 210
delivery and the Owners upon redelivery shall take over and pay for the 211
bunkers and lubricants on board at the prices prevailing at the times and 212
ports of delivery and redelivery. 213

**10. Hire and Payments** 214
(a) Hire. - The Charterers shall pay Hire for the Vessel at the rate stated in Box 215
19 per day or pro rata for part thereof from the time that the Vessel is delivered 216
to the Charterers until the expiration or earlier termination of this Charter 217
Party. 218
(b) Extension Hire. - If the option to extend the Charter Period under Clause 219
1(b) is exercised, Hire for such extension shall, unless stated in Box 20, be 220
mutually agreed between the Owners and the Charterers. 221
(c) Adjustment of Hire. - The rate of hire shall be adjusted to reflect 222
documented changes, after the date of entering into the Charter Party or the 223
date of commencement of employment, whichever is earlier, in the Owners' 224
costs arising from changes in the Charterers' requirements or regulations 225
governing the Vessel and/or its Crew or this Charter Party. 226
(d) Invoicing. - All invoices shall be issued in the contract currency stated in 227
Box 19. In respect of reimbursable expenses incurred in currencies other 228
than the contract currency, the rate of exchange into the contract currency 229
shall be that quoted by the Central Bank of the country of such other currency 230
as at the date of the Owners' invoice. Invoices covering Hire and other 231
payments due shall be issued monthly as stated in Box 21(b) or at the 232
expiration or earlier termination of this Charter Party. Notwithstanding the 233
foregoing, bunkers and lubricants on board at delivery shall be invoiced at 234
the time of delivery. 235
(e) Payments. - Payments of Hire, bunker invoices and disbursements for the 236
Charterers' account shall be received within the number of days stated in Box 237
23 from the date of receipt of the invoice. Payment shall be made in the 238
contract currency in full without discount to the account stated in Box 22. 239
However any advances for disbursements made on behalf of and approved by 240
the Owners may be deducted from Hire due. 241
If payment is not received by the Owners within 5 banking days following the 242
due date the Owners are entitled to charge interest at the rate stated in Box 24 243
on the amount outstanding from and including the due date until payment is 244
received. 245
Where an invoice is disputed, the Charterers shall in any event pay the 246
undisputed portion of the invoice but shall be entitled to withhold payment of 247
the disputed portion provided that such portion is reasonably disputed and 248
the Charterers specify such reason. Interest will be chargeable at the rate 249
stated in Box 24 on such disputed amounts where resolved in favour of the 250
Owners. Should the Owners prove the validity of the disputed portion of the 251
invoice, balance payment shall be received by the Owners within 5 banking 252
days after the dispute is resolved. Should the Charterers' claim be valid, a 253
corrected invoice shall be issued by the Owners. 254
In default of payment as herein specified, the Owners may require the 255
Charterers to make payment of the amount due within 5 banking days of 256
receipt of notification from the Owners; failing which the Owners shall have 257
the right to withdraw the Vessel without prejudice to any claim the Owners 258
may have against the Charterers under this Charter Party. 259
While payment remains due the Owners shall be entitled to suspend the 260
performance of any and all of their obligations hereunder and shall have no 261
responsibility whatsoever for any consequences thereof, in respect of which 262
the Charterers hereby indemnify the Owners, and Hire shall continue to 263
accrue and any extra expenses resulting from such suspension shall be for 264
the Charterers' account. 265
(f) Audit. - The Charterers shall have the right to appoint an independent 266
chartered accountant to audit the Owners' books directly related to work 267
performed under this Charter Party at any time after the conclusion of the 268
Charter Party, up to the expiry of the period stated in Box 25, to determine the 269
validity of the Owners' charges hereunder. The Owners undertake to make 270
their records available for such purposes at their principal place of business 271
during normal working hours. Any discrepancies discovered in payments 272
made shall be promptly resolved by invoice or credit as appropriate. 273

**11. Suspension of Hire** 274
(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of 275
Master, Officers and Crew, breakdown of machinery, damage to hull or other 276
accidents to the Vessel, the Vessel is prevented from working, no Hire shall be 277
payable in respect of any time lost and any Hire paid in advance shall be 278
adjusted accordingly provided always however that Hire shall not cease in the 279
event of the Vessel being prevented from working as aforesaid as a result of: 280

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between this original BIMCO approved document and this computer generated document.




PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

(i) the carriage of cargo as noted in Clause 5(c)(iii) and (iv); 281
(ii) quarantine or risk of quarantine unless caused by the Master, Officers or 282
Crew having communication with the shore at any infected area not in 283
connection with the employment of the Vessel without the consent or the 284
instructions of the Charterers; 285
(iii) deviation from her Charter Party duties or exposure to abnormal risks at 286
the request of the Charterers; 287
(iv) detention in consequence of being driven into port or to anchorage 288
through stress of weather or trading to shallow harbours or to river or 289
ports with bars or suffering an accident to her cargo, when the expenses 290
resulting from such detention shall be for the Charterers' account 291
howsoever incurred; 292
(v) detention or damage by ice; 293
(vi) any act or omission of the Charterers, their servants or agents. 294
(b) Liability for Vessel not Working. - The Owners' liability for any loss, 295
damage or delay sustained by the Charterers as a result of the Vessel being 296
prevented from working by any cause whatsoever shall be limited to 297
suspension of hire. 298
(c) Maintenance and Drydocking. - Notwithstanding sub-clause (a) hereof, the 299
Charterers shall grant the Charterers a maximum of 24 hours on hire, which shall 300
be cumulative, per month or pro rata for part of a month from the 301
commencement of the Charter Period for maintenance and repairs including 302
drydocking (hereinafter referred to as "maintenance allowance"). 303
The Vessel shall be drydocked at regular intervals. The Charterers shall place 304
the Vessel at the Owners' disposal often of cargo, at a port to be nominated 305
by the Owners at a later date) having facilities suitable to the Owners for the 306
purpose of such drydocking. 307
During reasonable voyage time taken in transits between such port and Area 308
of Operation the Vessel shall be on hire and such time shall not be counted 309
against the accumulated maintenance allowance. 310
Hire shall be suspended during any time taken in maintenance repairs and 311
drydocking in excess of the accumulated maintenance allowance. 312
In the event of less time being taken by the Owners for repairs and drydocking 313
or, alternatively, the Charterers not making the Vessel available for all or part 314
of this time, the Charterers shall, upon expiration or earlier termination of the 315
Charter Party, pay the equivalent of the daily rate of Hire then prevailing in 316
addition to Hire otherwise due under this Charter Party in respect of all such 317
time not so taken or made available. 318
Upon commencement of the Charter Period, the Owners agree to furnish the 319
Charterers with the Owners' proposed drydocking schedule and the 320
Charterers agree to make every reasonable effort to assist the Owners in 321
adhering to such predetermined drydocking schedule for the Vessel. 322

12. Liabilities and Indemnities 323
(a) Owners. - Notwithstanding anything else contained in this Charter Party 324
excepting Clauses 5(c)(iv), 7(b), 8(b), 12(b), 15(c) and 21, the Charterers shall 325
not be responsible for loss of or damage to the property of the Owners or of 326
their contractors and sub-contractors, including the Vessel, or for personal 327
injury or death of the employees of the Owners or of their contractors and 328
sub-contractors, arising out of or in any way connected with the performance 329
of this Charter Party, even if such loss, damage, injury or death is caused 330
wholly or partially by the act, neglect, or default of the Charterers, their 331
employees, contractors or sub-contractors, and even if such loss, damage, 332
injury or death is caused wholly or partially by unseaworthiness of any vessel; 333
and the Owners shall indemnify, protect, defend and hold harmless the 334
Charterers from any and against all claims, costs, expenses, actions, 335
proceedings, suits, demands and liabilities whatsoever arising out of or in 336
connection with such loss, damage, personal injury or death. 337
(b) Charterers. - Notwithstanding anything else contained in this Charter 338
Party excepting Clause 21, the Owners shall not be responsible for loss of, 339
damage to, or any liability arising out of anything towed by the Vessel, any 340
cargo laden upon or carried by the Vessel or her tow, the property of the 341
Charterers or of their contractors and sub-contractors, including their 342
offshore units, or for personal injury or death of the employees of the 343
Charterers or of their contractors and sub-contractors (other than the Owners 344
and their contractors and sub-contractors) or of anyone on board anything 345
towed by the Vessel, arising out of or in any way connected with the 346
performance of this Charter Party, even if such loss, damage, liability, injury 347
or death is caused wholly or partially by the act, neglect or default of the 348
Owners, their employees, contractors or sub-contractors, and even if such 349
loss, damage, liability, injury or death is caused wholly or partially by the 350
unseaworthiness of any vessel; and the Charterers shall indemnify, protect, 351
defend and hold harmless the Owners from any and against all claims, costs, 352
expenses, actions, proceedings, suits, demands, and liabilities whatsoever 353

arising out of or in connection with such loss, damage, personal injury, personal 354
injury or death. 355
(c) Consequential Damages. - Neither party shall be liable to the other for, and 356
each party hereby agrees to protect, defend and indemnify the other against, 357
any consequential damages whatsoever arising out of or in connection with 358
the performance or non-performance of this Charter Party, including, but not 359
limited to, loss of use, loss of profits, shut-in or loss of production and cost of 360
insurance. 361
(d) Limitations. - Nothing contained in this Charter Party shall be construed or 362
held to deprive the Owners or the Charterers, as against any person or party, 363
including as against each other, of any right to claim limitation of liability 364
provided by any applicable law, statute or convention, save that nothing in 365
this Charter Party shall create any right to limit liability. Where the Owners or 366
the Charterers may seek an indemnity under the provisions of this Charter 367
Party or against each other in respect of a claim brought by a third party, the 368
Owners or the Charterers shall seek to limit their liability against such third 369
party. 370
(e) Himalaya Clause. - (i) All exceptions, exemptions, defences, immunities, 371
limitations of liability, indemnities, privileges and conditions granted or 372
provided by this Charter Party or by any applicable statute, rule or regulation 373
for the benefit of the Charterers shall also apply to and be for the benefit of the 374
Charterers' parent, affiliated, related and subsidiary companies; the 375
Charterers' contractors, sub-contractors, clients, joint venturers and joint 376
interest owners; (always with respect to this job or project on which the Vessel 377
is employed); their respective employees and their respective underwriters. 378
(ii) All exceptions, exemptions, defences, immunities, limitations of liability, 379
indemnities, privileges and conditions granted or provided by this Charter 380
Party or by any applicable statute, rule or regulation for the benefit of the 381
Owners shall also apply to and be for the benefit of the Owners' parent, 382
affiliated, related and subsidiary companies, the Owners' sub-contractors, 383
the Vessel, its Master, Officers and Crew, its registered owner, its operator, its 384
demise charterer(s), their respective employees and their respective 385
underwriters. 386
(iii) The Owners or the Charterers shall be deemed to be acting as agent or 387
trustee of and for the benefit of all such persons and parties set forth above, 388
but only for the limited purpose of contracting for the extension of such 389
benefits to such persons and parties. 390
(f) Mutual Waiver of Recourse (Optional, only applicable if stated in Box 28, but 391
regardless of whether this option is exercised the other provisions of Clause 12 392
shall apply and shall be paramount) 393
In order to avoid disputes regarding liability for personal injury or death of 394
employees or for loss of or damage to property, the Owners and the 395
Charterers have entered into, or by this Charter Party agree to enter into, an 396
Agreement for Mutual Indemnity and Waiver of Recourse (in a form 397
substantially similar to that specified in ANNEX "C") between the Owners, the 398
Charterers and the various contractors and sub-contractors of the Charterers. 399
(g) Hazardous and Noxious Substances. - Notwithstanding any other 400
provision of this Charter Party to the contrary, the Charterers shall always be 401
responsible for any losses, damages or liabilities suffered by the Owners, 402
their employees, contractors or sub-contractors, by the Charterers, or by 403
third parties, with respect to the Vessel or other property, personal injury or 404
death, pollution or otherwise, which losses, damages or liabilities are caused, 405
directly or indirectly, as a result of the Vessel's carriage of any hazardous and 406
noxious substances in whatever form as ordered by the Charterers, and the 407
Charterers shall defend, indemnify the Owners and hold the Owners harmless 408
for any expense, loss or liability whatsoever or howsoever arising with 409
respect to the carriage of hazardous or noxious substances. 410

13. Pollution 411
(a) Except as otherwise provided for in Clause 15(c)(iii), the Owners shall be 412
liable for, and agree to indemnify, defend and hold harmless the Charterers 413
against, all claims, costs, expenses, actions, proceedings, suits, demands 414
and liabilities whatsoever arising out of actual or potential pollution damage 415
and the cost of cleanup or control thereof arising from acts or omissions of 416
the Owners or their personnel which cause or allow discharge, spills or leaks 417
from the Vessel, except as may emanate from cargo thereon or therein. 418
(b) The Charterers shall be liable for and agree to indemnify, defend and hold 419
harmless the Owners from all claims, costs, expenses, actions, proceedings, 420
suits, demands, liabilities, loss or damage whatsoever arising out of or 421
resulting from any other actual or potential pollution damage, even where 422
caused wholly or partially by the act, neglect or default of the Owners, their 423
employees, contractors or sub-contractors or by the unseaworthiness of the 424
Vessel. 425

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




## PART II
### "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

**14.Insurance** 426

(a)(i) The Owners shall procure and maintain in effect for the duration of this 427
Charter Party, with reputable insurers, the insurances set forth in ANNEX "B", 428
Policy limits shall not be less than those indicated. Reasonable deductibles 429
are acceptable and shall be for the account of the Owners. 430
(ii) The Charterers shall upon request be named as co-insured. The Owners 431
shall upon request cause insurers to waive subrogation rights against the 432
Charterers (as encompassed in Clause 12(a)(i)). Co-insurance and/or 433
waivers of subrogation shall be given only insofar as these relate to liabilities 434
which are properly the responsibility of the Owners under the terms of this 435
Charter Party. 436
(b) The Owners shall upon request furnish the Charterers with certificates of 437
insurance which provide sufficient information to verify that the Owners have 438
complied with the insurance requirements of this Charter Party. 439
(c) If the Owners fail to comply with the aforesaid insurance requirements, the 440
Charterers may, without prejudice to any other rights or remedies under this 441
Charter Party, purchase similar coverage and deduct the cost thereof from 442
any payment due to the Owners under this Charter Party. 443

**15.Saving of Life and Salvage** 444

(a) The Vessel shall be permitted to deviate for the purpose of saving life at 445
sea without prior approval of or notice to the Charterers and without loss of 446
Hire provided however that notice of such deviation is given as soon as 447
possible. 448
(b) Subject to the Charterers' consent, which shall not be unreasonably 449
withheld, the Vessel shall be at liberty to undertake attempts at salvage, it 450
being understood that the Vessel shall be off hire from the time she leaves 451
port or commences to deviate and she shall remain off-hire until she is again 452
in every way ready to resume the Charterers' service at a position which is not 453
less favourable to the Charterers than the position at the time of leaving port 454
or deviating for the salvage services. 455
All salvage monies earned by the Vessel shall be divided equally between the 456
Owners and the Charterers, after deducting the Master's, Officers' and Crew's 457
share, legal expenses, value of fuel and lubricants consumed, Hire of the 458
Vessel lost by the Owners during the salvage, repairs to damage sustained, if 459
any, and any other extraordinary loss or expense sustained as a result of the 460
salvage. 461
The Charterers shall be bound by all measures taken by the Owners in order 462
to secure payment of salvage and to fix its amount. 463
(c) The Owners shall waive their right to claim any award for salvage 464
performed on property owned by or contracted to the Charterers, always 465
provided such property was the object of the operation the Vessel was 466
chartered for, and the Vessel shall remain on hire when rendering salvage 467
services to such property. This waiver is without prejudice to any right the 468
Vessel's Master, Officers and Crew may have under any title. 469
If the Owners render assistance to such property in distress on the basis of 470
"no claim for salvage", then, notwithstanding any other provisions contained 471
in this Charter Party and even in the event of neglect or default of the Owners, 472
Master, Officers or Crew: 473
(i) The Charterers shall be responsible for and shall indemnify the Owners 474
against payments made, under any legal rights, to the Master, Officers 475
and Crew in relation to such assistance. 476
(ii) The Charterers shall be responsible for and shall reimburse the Owners 477
for any loss or damage sustained by the Vessel or her equipment by 478
reason of giving such assistance and shall also pay the Owners' 479
additional expenses thereby incurred. 480
(iii) The Charterers shall be responsible for any actual or potential spill, 481
seepage and/or emission of any pollutant howsoever caused occurring 482
within the offshore site and any pollution resulting therefrom 483
wheresoever it may occur and including but not limited to the cost of 484
such measures as are reasonably necessary to prevent or mitigate 485
pollution damage, and the Charterers shall indemnify the Owners 486
against any liability, cost or expense arising by reason of such actual or 487
potential spill, seepage and/or emission. 488
(iv) The Vessel shall not be off-hire as a consequence of giving such 489
assistance, or effecting repairs under sub-paragraph (ii) of this sub- 490
clause, and time taken for such repairs shall not count against time 491
granted under Clause 11(c). 492
(v) The Charterers shall indemnify the Owners against any liability, cost 493
and/or expense whatsoever in respect of any loss of life, injury, damage 494
or other loss to person or property howsoever arising from such 495
assistance. 496

**16.Lien** 497

The Owners shall have a lien upon all cargoes for all claims against the 498
Charterers under this Charter Party and the Charterers shall have a lien on the 499
Vessel for all monies paid in advance and not earned. The Charterers will not 500
suffer, nor permit to be continued, any lien or encumbrance incurred by them 501
or their agents, which might have priority over the title and interest of the 502
Owners in the Vessel. Except as provided in Clause 12, the Charterers shall 503
indemnify and hold the Owners harmless against any lien of whatsoever 504
nature arising upon the Vessel during the Charter Period while she is under 505
the control of the Charterers, and against any claims against the Owners 506
arising out of the operation of the Vessel by the Charterers or out of any 507
neglect of the Charterers in relation to the Vessel or the operation thereof. 508
Should the Vessel be arrested by reason of claims or liens arising out of her 509
operation hereunder, unless brought about by the act or neglect of the 510
Owners, the Charterers shall at their own expense take all reasonable steps to 511
secure that within a reasonable time the Vessel is released and at their own 512
expense put up bail to secure release of the Vessel. 513

**17.Sublet and Assignment** 514

(a) Charterers. - The Charterers shall have the option of subletting, assigning 515
or loaning the Vessel to any person or company not competing with the 516
Owners, subject to the Owners' prior approval which shall not be 517
unreasonably withheld, upon giving notice in writing to the Owners, but the 518
original Charterers shall always remain responsible to the Owners for due 519
performance of the Charter Party and contractors of the person or company 520
taking such subletting, assigning or loan shall be deemed contractors of the 521
Charterers for all the purposes of this Charter Party. The Owners make it a 522
condition of such consent that additional Hire shall be paid as agreed 523
between the Charterers and the Owners having regard to the nature and 524
period of any intended service of the Vessel. 525
(b) If the Vessel is sublet, assigned or loaned to undertake rig anchor 526
handling and/or towing operations connected with equipment, other than that 527
used by the Charterers, then a daily increment to the Hire in the amount as 528
stated in Box 29 pro rata shall be paid for the period between departure for 529
such operations and return to her normal duties for the Charterers. 530
(c) Owners. - The Owners may not assign or transfer any part of this Charter 531
Party without the written approval of the Charterers, which approval shall not 532
be unreasonably withheld. 533
Approval by the Charterers of such subletting or assignment shall not relieve 534
the Owners of their responsibility for due performance of the part of the 535
services which is sublet or assigned. 536

**18.Substitute Vessel** 537

The Owners shall be entitled at any time, whether before delivery or at any 538
other time during the Charter Period, to provide a substitute vessel, subject to 539
the Charterers' prior approval which shall not be unreasonably withheld. 540

**19.War** 541

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be 542
ordered nor continue to any port or place or on any voyage nor be used on 543
any service which will imperil the Vessel within a zone which is dangerous as a 544
result of any actual or threatened act of war, war, hostilities, warlike 545
operations, acts of piracy or of hostility or malicious damage against this or 546
any other vessel or its cargo by any person, body or state whatsoever, 547
revolution, civil war, civil commotion or the operation of international law, nor 548
be exposed in any way to any risks or penalties whatsoever consequent upon 549
the imposition of sanctions, nor carry any goods that may in any way expose 550
her to any risks of seizure, capture, penalties or any other interference of any 551
kind whatsoever by the belligerent or fighting powers or parties or by any 552
government or rulers. 553
(b) Should the Vessel approach or be brought or ordered within such zone, or 554
be exposed in any way to the said risks, (i) the Owners shall be entitled from 555
time to time to insure their interest in the Vessel for such terms as they deem 556
fit up to its open market value and also in the Hire against any of the risks 557
likely to be involved thereby, and the Charterers shall make a refund on 558
demand of any additional premium thereby incurred, and (ii) notwithstanding 559
the terms of Clause 11 Hire shall be payable for all time lost including any loss 560
owing to loss of or injury to the Master, Officers, Crew or passengers or to 561
refusal by any of them to proceed to such zone or to be exposed to such risks. 562
(c) In the event of additional insurance premiums being incurred or the wages 563
of the Master and/or Officers and/or Crew and/or the cost of provisions and/ 564
or stores for deck and/or engine room being increased by reason of or during 565
the existence of any of the matters mentioned in sub-clause (a) the amount of 566
any additional premium and/or increase shall be added to the Hire, and paid 567
by the Charterers on production of the Owners' account therefor, such 568

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



**PART II**
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

account being rendered monthly. 569
(d) The Vessel shall have liberty to comply with any orders or directions as to 570
departure, arrival, routes, ports of call, stoppages, destination, delivery or in 571
any other way whatsoever given by the government of the nation under whose 572
flag the Vessel sails or any other government or any person (or body) acting 573
or purporting to act with the authority of such government or by any 574
committee or person having under the terms of the war risks insurance on the 575
Vessel the right to give any such orders or directions. 576
(e) In the event of the outbreak of war (whether there be a declaration of war or 577
not) between any of the countries stated in Box 30 or in the event of the nation 578
under whose flag the Vessel sails becoming involved in war (whether there be 579
a declaration of war or not) either the Owners or the Charterers may terminate 580
this Charter Party, whereupon the Charterers shall redeliver the Vessel to the 581
Owners in accordance with PART I if it has cargo on board after discharge 582
thereof at destination or, if debarred under this Clause from reaching or 583
entering it, at a near open and safe port or place as directed by the Owners, or 584
if the Vessel has no cargo on board, at the port or place at which it then is or if 585
at sea at a near, open and safe port or place as directed by the Owners. In all 586
cases Hire shall continue to be paid and, except as aforesaid, all other 587
provisions of this Charter Party shall apply until redelivery. 588
(f) If in compliance with the provisions of this Clause anything is done or is not 589
done, such shall not be deemed a deviation. 590
The Charterers shall procure that all Bills of Lading (if any) issued under this 591
Charter Party shall contain the stipulations contained in sub-clauses (a), (d) 592
and (f) of this Clause. 593

**20. Excluded Ports** 594
(a) The Vessel shall not be ordered to nor bound to enter without the Owners' 595
written permission (a) any place where fever or epidemics are prevalent or to 596
which the Master, Officers and Crew by law are not bound to follow the Vessel; 597
(b) any ice-bound place or any place where lights, lightships, masks and 598
buoys are or are likely to be withdrawn by reason of ice and the Vessel's arrival 599
or where there is risk that ordinarily the Vessel will not be able on account of 600
ice to reach the place or to get out after having completed her operations. The 601
Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on 602
account of ice, the Master considers it dangerous to remain at the loading or 603
discharging place for fear of the Vessel being frozen in and/or damaged he 604
has liberty to sail to a convenient open place and await the Charterers' fresh 605
instructions. 606
(b) Should the Vessel approach or be brought or ordered within such place, 607
or be exposed in any way to the said risks, the Owners shall be entitled from 608
time to time to insure their interests in the Vessel and/or Hire against any of 609
the risks likely to be involved thereby on such terms as they shall think fit, the 610
Charterers to make a refund to the Owners of the premium on demand. 611
Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost 612
including any lost owing to loss of or sickness or injury to the Master, Officers, 613
Crew or passengers or to the action of the Crew in refusing to proceed to such 614
place or to be exposed to such risks. 615

**21. General Average and New Jason Clause** 616
General Average shall be adjusted and settled in London unless otherwise 617
stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. 618
Hire shall not contribute to General Average. Should adjustment be made in 619
accordance with the law and practice of the United States of America, the 620
following provision shall apply: 621
"In the event of accident, danger, damage or disaster before or after the 622
commencement of the voyage, resulting from any cause whatsoever, whether 623
due to negligence or not, for which, or for the consequence of which, the 624
Owners are not responsible, by statute, contract or otherwise, the cargo, 625
shippers, consignees or owners of the cargo shall contribute with the Owners 626
in General Average to the payment of any sacrifices, loss or expenses of a 627
General Average nature that may be made or incurred and shall pay salvage 628
and special charges incurred in respect of the cargo. 629
If a salving vessel is owned or operated by the Owners, salvage shall be paid 630
for as fully as if the said salving vessel or vessels belonged to strangers. Such 631
deposit as the Owners, or their agents, may deem sufficient to cover the 632
estimated contribution of the cargo and any salvage and special charges 633
thereon shall, if required, be made by the cargo, shippers, consignees 634
or owners of the cargo to the Owners before delivery". 635

**22. Both-to-Blame Collision Clause** 636
If the Vessel comes into collision with another ship as a result of the 637
negligence of the other ship and any act, neglect or default of the Master, 638
mariner, pilot or the servants of the Owners in the navigation or the 639

management of the Vessel, the Charterers will indemnify the Owners against 640
all loss or liability to the other or non-carrying ship or her owners insofar as 641
such loss or liability represent loss of or damage to, or any claim whatsoever 642
of the owners of any goods carried under this Charter Party paid or payable by 643
the other or non-carrying ship or her owners to the owners of the said goods 644
and set-off, recouped or recovered by the other or non-carrying ship or her 645
owners as part of their claim against the Vessel or the Owners. The foregoing 646
provisions shall also apply where the owners, operators or those in charge of 647
any ship or ships or objects other than or in addition to the colliding ships or 648
objects are at fault in respect of a collision or contact. 649

**23. Structural Alterations and Additional Equipment** 650
The Charterers shall have the option of, at their expense, making structural 651
alterations to the Vessel or installing additional equipment with the written 652
consent of the Owners which shall not be unreasonably withheld but unless 653
otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' 654
expense, to her original condition. The Vessel is to remain on hire during any 655
period of these alterations or reinstatement. The Charterers, unless otherwise 656
agreed, shall be responsible for repair and maintenance of any such 657
alteration or additional equipment. 658

**24. Health and Safety** 659
The Owners shall comply with and adhere to all applicable international, 660
national and local regulations pertaining to health and safety, and such 661
Charterers' instructions as may be appended hereto. 662
See clause 39. (Addendum 2)

**25. Taxes** 663
Each party shall pay taxes due on its own profit, income and personnel. The 664
Charterers shall pay all other taxes and dues arising out of the operation or 665
use of the Vessel during the Charter Period. 666
In the event of change in the Area of Operation or change in local regulation 667
and/or interpretation thereof, resulting in an unavoidable and documented 668
change of the Owners' tax fatality after the date of entering into the Charter 669
Party or the date of commencement of employment, whichever is the earlier, 670
Hire shall be adjusted accordingly. 671
See clause 27.

**26. Early Termination** 672
(a) For Charterers' Convenience. - The Charterers may terminate this Charter 673
Party at any time by giving the Owners written notice as stated in Box 15 and 674
by paying the settlement stated in Box 14 and the demobilisation charge 675
stated in Box 16, as well as Hire or other payments due under the Charter 676
Party. 677
(b) For Cause. - If either party becomes informed of the occurrence of any 678
event described in this Clause that party shall so notify the other party 679
promptly in writing and in any case within 3 days after such information is 680
received. If the occurrence has not ceased within 3 days after such 681
notification has been given, this Charter Party may be terminated by either 682
party, without prejudice to any other rights which either party may have, under 683
any of the following circumstances: 684
(i)   Requisition – If the government of the state of registry and/or the flag of 685
the Vessel, or any agency thereof, requisitions for hire or title or 686
otherwise takes possession of the Vessel during the Charter Period. 687
(ii)  Confiscation. - If any government, individual or group, whether or not 688
purporting to act as a government or on behalf of any government, 689
confiscates, requisitions, expropriates, seizes or otherwise takes 690
possession of the Vessel during the Charter Period. 691
(iii) Bankruptcy. - In the event of an order being made or resolution passed 692
for the winding up, dissolution, liquidation or bankruptcy of either party 693
(otherwise than for the purpose of reconstruction or amalgamation) or if 694
a receiver is appointed or if it suspends payment or ceases to carry on 695
business. 696
(iv) Loss of Vessel. - If the Vessel is lost, actually or constructively, or 697
missing, unless the Owners provide a substitute vessel pursuant to 698
Clause 18. In the case of termination, Hire shall cease from the date the 699
Vessel was lost or, in the event of a constructive total loss, from the date 700
of the event giving rise to such loss. If the date of loss cannot be 701
ascertained or the Vessel is missing, payment of Hire shall cease from 702
the date the Vessel was last reported. 703
(v)  Breakdown. - If, at any time during the term of this Charter Party, a 704
breakdown of the Owners' equipment or Vessel results in the Owners' 705
being unable to perform its obligations hereunder for a period 706
exceeding that stated in Box 32, unless the Owners provide a substitute 707

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.




## PART II
## "SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

vessel pursuant to Clause 18.     708
(vi) *Force Majeure.* - If a force majeure condition as defined in Clause 27     709
prevails for a period exceeding 15 consecutive days.     710
(vii)*Default.* - If either party is in repudiatory breach of its obligations     711
hereunder.     712
Termination as a result of any of the above mentioned causes shall not relieve     713
the Charterers of any obligation for Hire and any other payments due.     714

**27.Force Majeure**     715
Neither the Owners nor the Charterers shall be liable for any loss, damages or     716
delay or failure in performance hereunder resulting from any force majeure     717
event, including but not limited to acts of God, fire, action of the elements,     718
epidemics, war (declared or undeclared), warlike actions, insurrection,     719
revolution or civil strife, piracy, civil war or hostile action, strikes or     720
differences with workmen (except for disputes relating solely to the Owners'     721
or the Charterers' employees), acts of the public enemy, federal or state laws,     722
rules and regulations of any governmental authorities having or asserting     723
jurisdiction in the premises or of any other group, organisation or informal     724
association (whether or not formally recognised as a government), and any     725
other cause beyond the reasonable control of either party which makes     726
continuance of operations impossible.     727

**28.Notices and Invoices**     728
Notices and invoices required to be given under this Charter Party shall be     729
given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate.     730

**29.Wreck Removal**     731
If the Vessel sinks and becomes a wreck and an obstruction to navigation and     732
has to be removed upon request by any compulsory law or authority having     733
jurisdiction over the area where the wreck is placed, the Owners shall be     734
liable for any and all expenses in connection with the raising, removal,     735
destruction, lighting or marking of the wreck.     736

**30.Confidentiality**     737
All information or data obtained by the Owners in the performance of this     738
Charter Party is the property of the Charterers, is confidential and shall not be     739
disclosed without the prior written consent of the Charterers. The Owners     740
shall use their best efforts to ensure that the Owners, any of their     741
sub-contractors, and employees and agents thereof shall not disclose any     742
such information or data.     743

**31.Law and Arbitration**     744
*) (a) This Charter Party shall be governed by English law and any dispute     745
arising out of this Charter Party shall be referred to arbitration in London, one     746
arbitrator being appointed by each party, in accordance with the Arbitration     747
Acts 1950 and 1979 or any statutory modification or re-enactment thereof for     748
the time being in force. On the receipt by one party of the nomination in     749
writing of the other party's arbitrator that party shall appoint their arbitrator     750
within 14 days, failing which the arbitrator already appointed shall act as sole     751
arbitrator. If two arbitrators properly appointed shall not agree they shall     752
appoint an umpire whose decision shall be final.     753
*) (b) Should any dispute arise out of this Charter Party, the matter in dispute     754
shall be referred to three persons at New York, one to be appointed by each of     755
the parties hereto, and the third by the two so chosen; their decision or that of     756
any two of them shall be final, and for purpose of enforcing any award, this     757
agreement may be made a rule of the Court. The arbitrators shall be members     758
of the Society of Maritime Arbitrators, Inc. of New York and the proceedings     759
shall be conducted in accordance with the rules of the Society.     760
*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration     761
at the place stated in Box 33 subject to the law and procedures applicable     762
there.     763
(d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply.     764
*) (a). (b) and (c) are alternatives; state alternative agreed in Box 33     765

**32.Entire Agreement**     766
This is the entire agreement of the parties, which supersedes all previous     767
written or oral understandings and which may not be modified except by a     768

written amendment signed by both parties.     769

**33.Severability Clause**     770
If any portion of this Charter Party is held to be invalid or unenforceable for     771
any reason by a court or governmental authority of competent jurisdiction,     772
then such portion will be deemed to be stricken and the remainder of this     773
Charter Party shall continue in full force and effect.     774

**34.Demise**     775
Nothing herein contained shall be construed as creating a demise of     776
the Vessel to the Charterers.     777

**35.Definitions**     778
"Well' is defined for the purposes of this Charter Party as the time required to     779
drill, test, complete and/or abandon a single borehole including any side-     780
track thereof.     781
"Offshore unit' is defined for the purposes of this Charter Party as any vessel,     782
offshore installation, structure and/or mobile unit used in offshore     783
exploration, construction, pipelaying or repair, exploitation or production.     784
"Offshore site" is defined for the purposes of this Charter Party as the area     785
within three nautical miles of an "offshore unit" from or to which the Owners     786
are requested to take their Vessel by the Charterers.     787
"Employees' is defined for the purposes of this Charter Party as employees,     788
directors, officers, servants, agents or invitees.     789

**36.Headings**     790
The headings of this Charter Party are for identification only and shall not be     791
deemed to be part hereof or be taken into consideration in the interpretation     792
or construction of this Charter Party.     793

37. Taxation Clause
The sums, rates and prices quoted in this Charter are based on the
understanding that the revenue derived by Owners under this Charter does
not include any foreign taxes, including without limitation, corporate income
tax, withholding tax as applicable, personal income tax, social security, and
other payroll tax, duty, levy or charge of any kind, assessed or imposed by
any competent government authority or administrative body.

In the event that foreign taxes, based on this Charter, of any kind are levied
or imposed on Charterers or Owners, or of the Owners personnel than and
only if Owners evidence with official documentation that they can not credit
the payment of foreign taxes against the taxes paid in their fiscal domicile,
Charterer shall either pay such taxes directly or reimburse Owners the net
amount of such taxes, providing Owners can demonstrate that he has paid
such taxes. Owner is responsible for understanding and paying taxes in his
own jurisdiction and those of personnel's residency or citizenship. The
Charterer shall be responsible to continuously evaluate the use of the vessel
under this Charter realated to possible tax liabilities outside Owners
jurisdiction.

Owners shall be liable to fulfil all administrative requirements of any
competent government authority or administrative body, included but not
limited to, registration and filling of documents as appropriate. Charterer
shall contribute to obtain all necessary documentation regarding these
requirements.

For the purpose of this article only, "tax" includes any tax, impost, levy, duty,
withholding, fee, stamp duty charge or other assessment in the nature of tax
and any penalty or interest thereon and any other costs and charges
whatsoever assessed or imposed by any competent government authority or
administrative body in respect of this Charter, including any and all future
taxes which replace, or are of comparable nature to those presently in force.

This document is a computer generated SUPPLYTIME 89 form printed by authority of BIMCO. Any insertion or deletion to this form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

 

# EXHIBIT 2

## Ocean Mexicana S.A. de C.V. - due to Boa Offshore as of September 29, 2009

| Invoice No. | Type | Comment | USD | Due date/Pmt date | Curr. Date 9/29/2009 (days) | Interest rate 12.00% | BM 5/7/2009 | BM 6/4/2009 | BM 6/4/2009 | BM 8/18/2009 | BM 8/31/2009 | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19643 | Invoice | Hire June 2008 | 1,470,000.00 | 4/30/2008 | 517 | 249,859.73 | | | | | | 1,470,000.00 ? |
| 19713 | Invoice | Hire July 2008 | 1,515,000.00 | 5/30/2008 | 487 | 243,206.47 | | | | | | 1,519,000.00 ? |
| 19855 | Invoice | Hire August 2008 | 1,515,000.00 | 7/30/2008 | 426 | 212,743.23 | | | | | | 1,519,000.00 ? |
| 19960 | Invoice | Misc. expenses for crew / inspectors | 7,051.00 | 9/24/2008 | 370 | 857.71 | | | | | | 7,051.00 ? |
| 19961 | Invoice | Reimbursement of crane repair cost | 3,861.00 | 9/24/2008 | 370 | 469.67 | | | | | | 3,861.00 ? |
| 20010 | Invoice | Clearance cost for DP equipment | 229,214.00 | 10/17/2008 | 347 | 26,149.24 | | | | | | 229,214.00 ? |
| 20072 | Invoice | Misc. expenses related to drydocking May 2008 | 36,526.00 | 11/5/2008 | 328 | 3,917.24 | | | 35,515.80 | 810.20 | | 0.00 OK |
| 20071 | Invoice | Cost for delivery of Blue Marine items | 24,904.00 | 11/5/2008 | 328 | 2,685.54 | | | 24,904.00 | | | 0.00 OK |
| 20069 | Invoice | Pipe laying functionality / Add. GPC interface | 116,557.00 | 11/5/2008 | 328 | 12,569.00 | | | 116,557.00 | | | 0.00 OK |
| 20070 | Invoice | DNV inspections after repair | 2,700.00 | 11/5/2008 | 328 | 291.16 | | | | | | 2,700.00 ? |
| 20107 | Invoice | Misc. expenses Blue Marine personnel | 609.00 | 11/23/2008 | 310 | 62.07 | | | 403.80 | | | 205.20 only part payment? |
| 20157 | Invoice | Cash to Blue Marine representative | 300.00 | 12/5/2008 | 298 | 29.39 | | | | | | 300.00 ? |
| 20122 | Invoice | Reimbursement of crane repair cost | 77,654.00 | 12/19/2008 | 284 | 7,250.54 | | | | | | 77,654.00 ? |
| 20245 | Invoice | Hire March 2009 | 1,519,000.00 | 2/4/2009 | 237 | 118,357.15 | 457,381.39 | | | | | 1,061,618.61 only part payment? |
| 20287 | Invoice | Misc. expenses Blue Marine personnel | 3,935.00 | 2/22/2009 | 219 | 283.32 | | | | | | 3,935.00 ? |
| 20319 | Invoice | Hire April 2009 | 1,470,000.00 | 3/1/2009 | 212 | 102,456.99 | | 322,619.66 | | 1,147,380.14 | | 0.20 OK |
| 20406 | Invoice | Hire May 2009 | 1,519,000.00 | 3/31/2009 | 182 | 90,890.30 | | | | 451,809.66 | 200,000.00 | 867,190.34 only part payment? |
| 20445 | Invoice | Hire June 2009 | 1,470,000.00 | 4/30/2009 | 152 | 73,893.93 | | | | | | 1,470,000.00 ? |
| 20512 | Invoice | On account payment - not allocated | -457,381.39 | 5/7/2009 | 145 | -21,803.93 | | | | | | N/A OK |
| N/A | Bank | On account payment - not allocated | -322,619.66 | 6/4/2009 | 117 | -12,409.81 | | | | | | N/A OK |
| 20512 | Invoice | Hire July 2009 | 1,519,000.00 | 5/30/2009 | 122 | 60,916.47 | | | | | | 1,519,000.00 ? |
| N/A | Bank | On account payment - not allocated | -177,380.34 | 6/4/2009 | 117 | -6,833.07 | | | | | | N/A OK |
| 20575 | Invoice | Hire August 2009 | 1,519,000.00 | 7/2/2009 | 89 | 44,446.36 | | | | | | 1,519,000.00 ? |
| 20641 | Bank | On account payment - not allocated | -1,470,000.00 | 7/30/2009 | 61 | -29,480.55 | | | | | | N/A OK |
| 20575 | Invoice | Hire September 2009 | 1,519,000.00 | 7/30/2009 | 61 | 7,590.36 | | | | | | 1,519,000.00 ? |
| 20700 | Invoice | Hire October 2009 | 1,470,000.00 | 9/13/2009 | 16 | 7,590.36 | | | | | | 1,470,000.00 ? |
| N/A | Bank | On account payment - not allocated | -1,600,000.00 | 8/18/2009 | 42 | -22,093.15 | | | | | | N/A OK |
| N/A | Bank | On account payment - not allocated | -200,000.00 | 8/31/2009 | 29 | -1,906.85 | | | | | | N/A OK |
| **Total balance principal** | | | **14,258,729.61** | | Acc. interest | **1,223,345.37** | 457,381.39 | 322,619.66 | 177,380.60 | 1,600,000.00 | 200,000.00 | **14,258,729.35** |
| | | | | | | | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | |

error /m BM — immaterial

BLANK ROME LLP
Attorneys for Plaintiff
Jeremy J.O. Harwood
Alan M. Weigel
405 Lexington Avenue
The Chrysler Building
New York, NY  10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BOA OFFSHORE AS,<br><br>                              Plaintiff,<br><br>              v.<br><br>OCEAN MEXICANA S.A. de C.V.,<br><br>                              Defendant. | 09 Civ.<br><br>**AFFIDAVIT UNDER<br>SUPPLEMENTAL RULE B** |

STATE OF NEW YORK        )
                                           : ss.:
COUNTY OF NEW YORK     )

ALAN M. WEIGEL, being duly sworn, deposes and says:

1.      I am a member of the Bar of this Honorable Court and I am associated with

the firm of Blank Rome LLP, attorneys for the Plaintiff herein.  I am familiar with the

circumstances of the complaint and submit this affidavit in support of Plaintiff's request

for the issuance of process of maritime attachment and garnishment of the property of

defendant OCEAN MEXICANA S.A. de C.V., a corporation organized and existing by

virtue of another foreign nation with an office at Paseo de la Reforma, 115 Pisoll, Col.

900200.00001/6791834v.1

Lomas de Chapultepec, Mexico, D.F., pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

2.    The defendant is not incorporated or registered to do business in this State.

3.    Under my supervision, my office did an on-line search of the New York State Secretary of State, Division of Corporations and Transportation Tickler, telephone assistance in New York City and the internet Yellow Pages.

4.    In our search, we did not find any listing or reference to defendant in this district or state.  In the circumstances, I believe the defendants cannot be "found" within this district.

5.    We have been advised that the U.S. Marshal's Service lacks sufficient staff to effect service of Process of Maritime Attachment and Garnishment promptly or economically.  I respectfully request that the Court appoint Michael Watson, or any other person appointed by Blank Rome LLP who is over 18 years of age and is not a party to this action, to serve Process of Maritime Attachment and Garnishment and supplemental process on the garnishees named in Schedule A to the Order Directing Clerk to Issue Process of Maritime Attachment and Garnishment and Appointing Process Service, or upon any other or additional garnishees as may be named in any supplemental Process of Maritime Attachment and Garnishment.

_____
Alan M. Weigel

Sworn to before me this
2nd day of October, 2009

_____
Notary Public

KARL V. REDA
Notary Public, State of New York
No. 30-4783126, Qual. in Nassau Cty.
Certificate Fil d in New York County
Commission Exp res

Nov 30, 2009

900200.00001/6791834v.1